VIRGINIA L. KOPERSKI, APPELLANT, V.
HUSKER DODGE, INC., A CORPORATION, ET AL.,
APPELLEES.

302 N.W.2d 655

Filed February 13, 1981. No. 43093.

James A. Hogan for appellant.

Harold L. Hadland of Cassem, Tierney, Adams, Gotch & Douglas for appellee Chrysler Corp.

Hansen & Engles for appellee U.S. Nat. Bank.

James R. Sacoman of Seminara, Caniglia, Turco, McCarthy & Sacoman for appellee Husker Dodge.

Heard before BOSLAUGH, BRODKEY, and WHITE, JJ., and CASE and GARDEN, District Judges.

BRODKEY, J.

Virginia L. Koperski (Virginia), plaintiff below, appeals to this court from a decree entered by the District Court of Douglas County on October 3, 1979, dismissing her petition in an action filed by her against the defendants, Husker Dodge, Inc., Chrysler Corporation, and United States National Bank, seeking revocation of a contract entered into between her and the defendant Husker Dodge, Inc., and also for a judgment against the defendants and each of them for both direct and consequential damages suffered by her as a result of alleged defects in the automobile purchased by her. We affirm.

In her second amended petition, filed on August 7, 1979, plaintiff sets out five causes of action against the defendants Husker Dodge and Chrysler, setting forth her claims against those defendants arising out of the sale to her of a 1978 Dodge Diplomat automobile, and based on allegations of breach of warranty, rescission of contract and revocation of acceptance of the automobile, and a violation of the Consumer Product Warranties Act (Magnuson-Moss Act), 15 U.S.C. §§ 2301 et seq. The defendants each filed separate answers to the second amended petition. In its separate answer, Husker Dodge, Inc., alleged as a defense that the contract for the sale of the automobile referred to provided that it was sold "as is" by said defendant and that the contract excluded any implied warranty of merchantability, any implied warranty of fitness, and, further, denied that it had breached any warranty in connection with the sale of the vehicle. It also alleged that the plaintiff had not sustained damages as prayed

and, further, denied that plaintiff's petition stated a cause of action against them under the terms of the Magnuson-Moss Act. In its separate answer, defendant Chrysler Corporation alleged that the 1978 Dodge Diplomat automobile purchased by plaintiff was accompanied by an express limited warranty from Chrysler Corporation, under the terms of which limited warranty the exclusive obligation of Chrysler Corporation was to repair or replace any part or parts of the vehicle which proved defective in normal use, and that it had seasonably fulfilled all obligations in connection with such warranty. It also denied that the plaintiff had sustained direct and consequential damages as a result of any act or omission on the part of that defendant. Defendant U.S. National Bank was made a party to the action by virtue of a loan made by it to the plaintiff to finance the balance of the purchase price of the automobile. In its answer, the bank generally denied each of the allegations against it contained in plaintiff's second amended petition.

The case was tried in the District Court of Douglas County on August 20, 1979, and the court entered its decree in said case on October 3, 1979. In its decree the trial court found generally in favor of the defendants and against the plaintiff, and specifically found with regard to plaintiff's first cause of action based upon revocation of acceptance that the plaintiff had failed to prove by the evidence that there was a substantial impairment of value of the motor vehicle in question, and further failed to show that repairs were not seasonably performed by the defendants, but, on the contrary, that repairs were made within a reasonable length of time after notice to the defendants. The court specifically found with reference to plaintiff's second cause of action based upon an alleged breach of an express warranty by the defendant Husker Dodge that said defendant had expressly excluded all express and implied warranties under the provisions of Neb. U.C.C. § 2-316 (Reissue 1971), and that defendant

Chrysler Corporation had expressly limited its warranty to repairs and/or replacement of defective parts, and determined that under the evidence adduced the defendant had fully complied with the obligations of its limited warranty. In its decree the court specifically found with regard to plaintiff's third cause of action based upon a violation of the Magnuson-Moss Act that Husker Dodge had offered no warranty in its contract; that the manufacturer, Chrysler Corporation, had complied with the requirements of the Magnuson-Moss Act and had conspicuously designated its warranty as a limited warranty; and that therefore the Magnuson-Moss Act was not in question in the lawsuit. The court also specifically found with regard to plaintiff's fourth and fifth causes of action that the plaintiff had failed to prove any breach of warranty. The court therefore decreed that plaintiff's petition should be dismissed at plaintiff's cost. Following the overruling of a motion for a new trial, plaintiff perfected her appeal to this court.

In her brief on appeal, the plaintiff assigns as error: (1) That contrary to the finding of the court, the evidence was sufficient to establish a substantial impairment of value of the motor vehicle; (2) That the court erred in finding that the repairs were properly performed; (3) That the court erred in finding that the disclaimer of warranty on the part of Husker Dodge, Inc., was "conspicuous" and constituted an effective disclaimer of warranty; (4) That the court erred in finding that the defendants Husker Dodge, Inc., and Chrysler Corporation had not breached certain express warranties running in favor of plaintiff; (5) That the court erred in finding that defendant Chrysler Corporation had not breached its express warranties by failing to make proper repairs and/or replacement of defective parts on the automobile purchased by plaintiff; and (6) That the court erred in failing to grant plaintiff the remedy of revocation of acceptance.

The evidence in this case reveals that Virginia was a recent college graduate, and was 25 years of age at the time of the transaction in question. On June 12, 1978, Virginia entered into a purchase contract for a 1978 Dodge Diplomat with Husker Dodge, Inc., a Chrysler dealership in Omaha, Nebraska. The vehicle buyer's order recited a purchase price of $6,000. On that date, she also requested permission to take the car for a test drive, but the salesman informed her that she could only drive a demonstrator vehicle, and not the car she purchased. On June 15, 1978, she took delivery of the vehicle; and on that date various other documents were signed by the plaintiff, including a new car buyer's information sheet which listed numerous notices concerning the vehicle and applicable warranties, the car invoice, an odometer mileage statement, and the car delivery acknowledgment. Virginia made the $1,000 downpayment and arranged to finance the remaining balance through defendant U.S. National Bank.

Upon delivery of the car, Virginia noticed grease marks on the vehicle's headlining, front seat, and floorboard, and was told by the salesman that she could make an appointment to have the car cleaned. Within a few days following delivery of her automobile, Virginia began to experience difficulties with it. Testimony revealed that the car would vibrate at speeds of 35 to 40 miles per hour; that the motor killed when the air-conditioner was turned on; and that the engine would die when placed into reverse. On or about June 20, 1978, she returned the car to Husker Dodge to be cleaned and repaired.

A warranty repair order, dated June 20, 1978, indicates that the plaintiff's car was worked upon by the mechanics of defendant Husker Dodge, and that foreign material was removed from the carburetor. However, Virginia's difficulties with the Dodge did not end after this repair, and the testimony shows that she returned the car to Husker Dodge on June 22,

1978, because the engine would still die when the car was placed in reverse. At this time the plaintiff informed a service representative that she wanted the car repaired by June 30, 1978, the date of a planned family vacation to Wisconsin. Plaintiff left the vehicle to be repaired and the second warranty repair order admitted at trial indicates that the automobile's entire transmission was replaced by Husker Dodge on June 30, 1978, without charge to plaintiff. When Virginia returned for the car, she insisted on test driving it before taking it home. She testified that during the test drive the car made a high-pitched noise which emanated from the rear end, and she was told by a service mechanic that the rear end would be "going out" within 6 months. Virginia stated that when the vehicle was put into reverse gear, it again died. The record further reveals that plaintiff took the car with her on the trip to Wisconsin, having made arrangements to have the car repaired upon her return. Virginia and her parents testified that during the trip to Wisconsin the car's transmission difficulties continued, and that family members even had to push the car out of parking spaces when it failed to go into reverse. On July 5, 1978, Virginia returned from Wisconsin and took the car back to Husker Dodge for repair. The third warranty repair order admitted in evidence indicates that on that occasion the automobile's radiator was removed and a transmission cooler was replaced. Virginia returned for the car on July 8, 1978, and upon test driving the vehicle found that, while it would now go into reverse, a rubbing metallic sound was produced when the car was driven. Upon reporting these facts to the mechanic, she was instructed by him to take the car home and drive it for a week. She testified that during that period the car did not automatically shift gears when she pressed on the accelerator, but would either stop or jerk forward suddenly. Virginia's mother testified that she had occasion to drive the car during this

period, and related an incident which occurred when she crossed an intersection in Omaha. Mrs. Koperski stated that the automobile stalled in the middle of the intersection and would not move forward when she stepped on the accelerator or when she shifted gears. Finally, on restarting the car's engine, she was able to drive the car, but it would jerk forward suddenly. Mrs. Koperski expressed the opinion that the car was unsafe to drive.

It appears that during this same period Virginia secured a position in California. On July 25, 1978, she was scheduled to fly to California, and her father drove her to the airport in the Dodge. Mr. Koperski, a truck mechanic by profession, testified that on the way back from the airport he attempted to pull out onto Abbott Drive, but the car would not move. He stated that when he pressed on the accelerator nothing happened. He further stated that when he again pressed on the accelerator the car "shot" across Abbott Drive. He also stated that as he drove the vehicle it made a great deal of noise and he feared that the transmission might explode. At trial, he also expressed the opinion that the automobile was dangerous to drive.

Mr. Koperski returned the vehicle to Husker Dodge on that date and informed the service manager that his daughter wanted a replacement car. It appears that the Koperskis had previously notified their attorney as to their difficulties with the car, and on July 25, 1978, he sent a letter to defendants Husker Dodge and Chrysler Corporation requesting a replacement vehicle or, in the alternative, plaintiff would rescind the contract. He requested a return of the purchase price, as well as damages. On August 4, 1978, without the knowledge of the plaintiff, a second replacement transmission was installed in the vehicle. However, there is no question that even after installation of the second transmission, the Koperskis still did not pick up the car. Thereafter, Koperski received notice that the

car had been repossessed by the defendant bank and would be sold unless redeemed. Virginia did not redeem the automobile, and it was thereafter sold at a private sale for $5,100.

It will be helpful at the outset to determine the scope of review in this court of the action filed by the plaintiff herein, and the judgment of the trial court now here on appeal. It would appear from the record that the parties considered this action to be an action at law tried to the court without a jury, and tried the case on that theory. Neither the plaintiff nor the defendants contend to the contrary in this appeal, nor does the plaintiff on appeal contend that the action was one in equity and not one at law. Plaintiff's action was clearly brought under the statutory provisions of the Nebraska Uniform Commercial Code. While it is true that in her petition, in addition to her prayer for damages arising out of the sale of the automobile in question, plaintiff also prays for both a revocation of her acceptance of the vehicle and rescission of the contract, we conclude that the use of the term "rescission" in the petition does not automatically transform the action into an equity action. Although rescission was originally an equitable remedy, it is now clear that there are two types of rescission, one being applied to a law action and the other designated as equitable rescission. *Aron v. Mid-Continent Co.*, 141 Neb. 806, 4 N.W.2d 884 (1942); 12A C.J.S. *Cancellation of Inst.* § 4 (1980). The Uniform Commercial Code, however, does not use the term "rescission" with reference to Neb. U.C.C. § 2-608 (Reissue 1971), but refers to that remedy under its statutory provisions as "revocation of acceptance." In White & Summers, Uniform Commercial Code (2d ed. 1980), these authorities discuss the relationship between "rescission" and "revocation of acceptance" in § 8-1 at 295, as follows: "A word should be devoted to that ambiguous action called 'rescission.' Some use the word rescission to encompass what the Code defines as a rejection or

revocation of acceptance; others use it to mean simply the buyer's act in returning the goods; still others use it to cover the buyer's cancellation of the executory terms of the contract; and finally some might call it the buyer's cause of action for fraud, (including presumably the return of the goods, cancellation of the executory portion of the contract and the return of money paid). It is the apparent intention of the drafters to restrict the word rescission to a rather limited number of cases, those involving a mistake or in which the seller has committed fraud, duress, or the like. Comment 1 to § 2-608 makes the point as follows: 'The section no longer speaks of "rescission," a term capable of ambiguous application either to transfer of title to the goods or to the contract of sale and susceptible also of confusion with cancellation for cause of an executed or executory portion of the contract.' *If the seller has not committed mistake, fraud, or the like, we believe that the Code preempts the field and that the buyer's only rights to return the goods are those stated in Article Two."* (Emphasis supplied.) More important, however, it appears to be the general rule that where a statute provides an adequate remedy at law, equity will not entertain jurisdiction, and the statutory remedy must be exhausted before equity may be resorted to. So, when jurisdiction has become concurrent through statutory enlargement of the legal remedy, a court of equity, although recognizing the existence of its jurisdiction, will generally decline to exercise it where the remedy at law is complete and adequate, and no special circumstances exist demanding the interference of equity. See 30 C.J.S. *Equity* § 23(2) (1965). Nebraska, in a long line of cases, has adopted and follows the aforesaid rule. In *Bend v. Marsh,* 145 Neb. 780, 784, 18 N.W.2d 106, 109-10 (1945), this court, citing *Brandeen v. Beale,* 117 Neb. 291, 220 N.W. 298 (1928), stated: "'"The rule obtains in this and some other jurisdictions that equity will not afford relief if the complainant has a remedy by

statutory proceeding in the original action, and that to be entitled to equitable relief against the enforcement of a judgment procured by fraud the party must not have neglected to avail himself of a statutory remedy. [Citations omitted.]""""

Our conclusion is, therefore, that plaintiff's action, being based upon the Nebraska Uniform Commercial Code, and tried upon that theory, was an action at law tried to the court without a jury.

We therefore examine the scope of review by this court in a case tried to the court without a jury. In *Countryside Mobile Homes of Lincoln, Inc. v. Schade,* 204 Neb. 209, 281 N.W.2d 756 (1979), we stated the rule to be that in a trial to the court the findings and judgment of the trial court on the facts have the same force as a jury verdict and will not be set aside if there is sufficient competent evidence to support it, citing *Burhoop v. Pegram,* 194 Neb. 606, 234 N.W.2d 828 (1975). Also, in *Brandt v. Mayer,* 196 Neb. 751, 757, 246 N.W.2d 203, 206 (1976), we stated: "The case below was tried to the court. Our rule is well-established. Where a law action is tried to the court without a jury, the finding of the court has the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong." See, also, *Siefford v. Housing Authority,* 192 Neb. 643, 223 N.W.2d 816 (1974). In *Brandt v. Mayer, supra* at 755, 246 N.W.2d at 205, we also stated: "It is the function of this court to independently determine if sufficient evidence was presented to sustain the trial court's finding and judgment, giving due regard to the fact the trial court had an opportunity to observe the witnesses where the testimony is in conflict."

In the instant case, the matter was tried to the court without a jury, and findings and conclusions of the trial court have already been discussed. We are governed in this case by the rules previously announced.

It is clear that the instant transaction constitutes a

sale of goods governed by article 2 of the Uniform Commercial Code.

In her first cause of action, the plaintiff seeks to revoke her acceptance of the Dodge automobile under the provisions of § 2-608, which states:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it.

"(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

"(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

"(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

In *Countryside Mobile Homes of Lincoln v. Schade, supra,* a case which involved the sale of a mobile home, this court held that under § 2-608 a buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured. In that case, however, this court held that there was sufficient evidence in the record to support the finding of the trial court that after acceptance the appellee found defects that substantially impaired the value of the mobile home, and stated: "Although neither conclusive nor the only evidence supporting diminution of value is the fact that the mobile home at public sale on January 16th brought

$7,000. This was less than one-half its value when sold to the appellee." *Id.* at 215, 281 N.W.2d at 759.

In the instant case, the court found that the plaintiff failed to prove that there was a substantial impairment of the value of the motor vehicle; and evidence in the record indicates that, upon repossession by the bank, the vehicle was sold for $5,100, or approximately 85 percent of plaintiff's original purchase price. We are not prepared to say that the trial court erred in its holding in the instant case that there was no proof of a substantial impairment of value in the motor vehicle. It appears to be the general rule that the questions of whether goods are substantially impaired by nonconformity or whether revocation of acceptance is given within a reasonable time are questions of fact subject to the jury's determination. *Conte v. Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 374 A.2d 144 (1976). See, also, *Asciolla v. Manter Oldsmobile-Pontiac, Inc.*, 117 N.H. 85, 370 A.2d 270 (1977). Likewise, in *Peckham v. Larsen Chevrolet-Buick-Oldsmobile*, 99 Idaho 675, 679, 587 P.2d 816, 820 (1978), the court stated:

"A further factual issue appears to remain regarding the conformity of the goods. Here there appears to be a dispute as to whether the goods were accepted by Peckham in a defective nonconforming condition or whether he accepted the goods upon assurance by the seller that the defects would be remedied. As stated by I.C. § 28-2-608, comment 2:

"'[r]evocation of acceptance is possible only where the nonconformity substantially impairs the value of the goods to the buyer. For this purpose, the test is not what the seller had reason to know at the time of contracting; the question is whether the nonconformity is such as will in fact cause a substantial impairment of value to the buyer though the seller had no advance knowledge as to the buyer's particular circumstances.'

"An exhaustive discussion of what constitutes substantial impairment to a buyer is unnecessary since it

is held each case must be examined on its own merits to determine what is a substantial impairment of value to the particular buyer."

Our conclusion is that the finding of the trial court on this issue was not clearly wrong and hence will not be disturbed on appeal. *Brandt v. Mayer*, 196 Neb. 751, 246 N.W.2d 203 (1976).

We now turn to a discussion of what warranties, if any, were made by Husker Dodge, the seller of the automobile, and/or Chrysler Corporation, the manufacturer of the vehicle. With respect to Husker Dodge, it is clear from the record that it gave no separate warranty, express or implied, to the plaintiff, and in fact the evidence revealed that Husker Dodge expressly excluded all express and implied warranties on the sale of the automobile, under the provisions of § 2-316, and the court so found in its decree. There appears on the face of the vehicle buyer's order given by Husker Dodge the following disclaimer:

"AS IS

Customer note that the vehicle is being sold 'AS IS' by the Selling Dealer. Should the Manufacturer's Warranty apply to this vehicle, it is directly offered by the Manufacturer to the Customer. . . ."

In addition, the document referred to contains a disclaimer by the dealer of express or implied warranties as to merchantability or fitness of purpose. There is no question that Husker Dodge's disclaimer of warranties contained on their vehicle buyer's order was "conspicuous" as required by § 2-316(2). That term is defined in Neb. U.C.C. § 1-201(10) (Reissue 1971) as follows: " 'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as, NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type *or color*. . . ." (Emphasis supplied.) In the instant case the disclaimer of warranties of mer-

chantability and fitness for purpose was printed in contrasting red print. The comment to the above section defining "conspicuous" states: "This is intended to indicate some of the methods of making a term attention-calling. But the test is whether attention can reasonably be expected to be called to it." There is no question that in the instant case Husker's disclaimer of warranties, printed on its document in the manner above indicated, was sufficient to call attention to such disclaimer. In addition, we note that § 2-316(3) provides in part:

"(3) Notwithstanding subsection (2)

"(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty . . . ." In this connection, see, also, *Gilliam v. Indiana Nat. Bank*, 337 So.2d 352 (Ala. Civ. App. 1976).

The evidence in the record of this case clearly indicates that the only warranty in existence was the express limited warranty furnished by the defendant Chrysler Corporation, which was included among the various documents given to plaintiff at the time of the purchase of the automobile in question.

We set forth hereafter in full the complete text of Chrysler's limited warranty:

"BASIC COVERAGE — For the first 12 months or 12,000 miles (20 000 km), whichever occurs first, any part of this vehicle supplied by Chrysler, except tires, which proves defective in normal use will be repaired or replaced by the Selling Dealer using new or re-manufactured parts.

"ADJUSTMENTS — During the first 3 months of the warranty period, the Selling Dealer will also perform any adjustment service required as a result of a manufacturing deficiency. Thereafter, adjustments will be considered owner maintenance responsibility unless

required as a direct result of repair or replacement of a defective part under this warranty.

"WARRANTY START DATE — This warranty starts on the date of original retail delivery or original use, whichever occurs first.

"OBTAINING WARRANTY SERVICE — To obtain warranty or adjustment service, the owner must return this vehicle to the Selling Dealer's place of business where such service will be performed without charge for parts or labor. In the event the owner is travelling or has moved to a different locality and cannot return to the Selling Dealer, warranty and adjustment service may be obtained from any authorized Chrysler Corporation dealer who sells the same make vehicle.

"WHAT IS NOT COVERED — This warranty will not apply to:

• A vehicle on which the odometer reading is altered;
• Maintenance services as specified in the Operating Instructions & Product Information Booklet supplied with this vehicle and the parts used in connection with such services;
• Repairs required as a result of failure to properly care for or maintain this vehicle, fire, accident, abuse or negligence;
• Loss of use of the vehicle, loss of time, inconvenience, expense for gasoline, telephone, travel or lodging, loss or damage to personal property, commercial loss, loss of revenue, or other matters not specifically included are not covered.

* * * * * * * * * *

"This warranty gives the owner specific legal rights and the owner may also have other rights which vary from state to state.

"THIS WARRANTY IS THE ONLY EXPRESS WARRANTY MADE BY CHRYSLER APPLICABLE TO THIS VEHICLE. ANY IMPLIED WARRANTY APPLICABLE TO THIS VEHICLE IS LIMITED IN DURATION TO THE DURATION OF THIS WRITTEN WARRANTY.

"Some states do not allow the exclusion or limitation of incidental or consequential damages or limitations on how long an implied warranty lasts, so the above limitations or exclusions may not apply to you.

"This warranty applies to the 50 United States and Canada. It applies to all owners of this vehicle during the time and mileage (kilometres) limitations expressed herein."

It is clear that under the terms of Chrysler's limited warranty, as set out above, its liability under such warranty is limited to repair or replacement of defective parts for the first 12 months or 12,000 miles, whichever occurs first. This is the only warranty involved in this litigation, as Husker Dodge had sold the vehicle to the buyer under an "as is" restriction and properly disclaimed all other warranties.

Chrysler Corporation contends, however, in its brief and argument that it is not liable under its limited warranty to the plaintiff herein because of failure of privity of contract between it and the buyer of the vehicle, pointing out that it was not the "seller" of the vehicle, but, on the contrary, that the sale of the vehicle was a transaction between Husker Dodge and the plaintiff. We point out, however, that Chrysler Corporation's warranty, although limited in scope, was a direct representation and warranty made by Chrysler to the purchaser. Chrysler's contention is effectively answered by White & Summers, Uniform Commercial Code, § 11-7 at 410-11 (2d ed. 1980), where those authorities state: "When the non-privity plaintiff's suit is not based upon 402A or implied warranty, but rather upon defendant's express representation made to the particular plaintiff in advertising or otherwise, courts generally hold that the plaintiff need not be in privity with the defendant. Usually courts characterize such cases as express warranty cases, though in some jurisdictions they are classed as misrepresentation cases. The misrepresentation may come through the defendant's advertising, through

labels attached to the product, or through brochures and literature about the product. The only limitation is that the plaintiff must be a party whom the defendant could expect to act upon the representation. Of course, any such plaintiff must also state the other elements of his cause of action.

"It is possible that lack of privity as a defense to a cause of action will be only a historic relic in the year 2000. It is a doctrine in hasty retreat; its current vitality is largely in cases in which plaintiffs seek recompense for economic loss." We point out again, however, that in this case the limited express warranty of Chrysler Corporation is not based upon merely a warranty allegedly arising in advertising materials, but is a direct written or printed warranty to the purchaser of the automobile, included with the other documents of the seller in the consummation of the sale of the vehicle. In this connection, see *Hawkins Constr. Co. v. Matthews Co., Inc.,* 190 Neb. 546, 209 N.W.2d 643 (1973).

There is no question that under the law Chrysler Corporation could legally limit its liability under its express warranty, as it did in this case. It is clear from the record that, contrary to the contentions of the plaintiff, Chrysler Corporation fully complied with the requirements of the Consumer Product Warranties Act (Magnuson-Moss Act), 15 U.S.C. §§ 2301 to 2312, inclusive. The trial court in its decree found that it had done so, and that the applicability of the Magnuson-Moss Act was not a question in this lawsuit.

"Repair and replacement" clauses, in the nature of those contained in Chrysler's limited warranty, have become the basic mechanism by which manufacturers limit or avoid liability in actions for breach of warranty. The clause provides both a remedy to the buyer, whereby he may obtain goods conforming to the contract, and a limitation of the liability of the manufacturer. See *Beal v. General Motors Corporation,* 354 F. Supp. 423 (D. Del. 1973). The authority to limit a

buyer's remedies under a warranty is found in Neb. U.C.C. § 2-719 (Reissue 1971), which provides in pertinent part as follows:

"(1) Subject to the provisions of subsections (2) and (3) of this section . . .

"(a) *the agreement may provide for remedies in addition to or in substitution for those provided in this article* and may limit or alter the measure of damages recoverable under this article, *as by limiting the buyer's remedies* to return of the goods and repayment of the price or *to repair and replacement of nonconforming goods or parts;*

. . . .

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act.

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." (Emphasis supplied.)

The general rule appears to be that language of a warranty limiting the buyer's remedies to repair or replacement of defective parts is not, on its face, unconscionable. *Murray v. Holiday Rambler, Inc.*, 83 Wis. 2d 406, 265 N.W.2d 513 (1978); *Ford Motor Co. v. Mayes*, 575 S.W.2d 480 (Ky. 1978); *Cox Motor Car Company v. Castle*, 402 S.W.2d 429 (Ky. 1966); *Potomac Electric Pow. Co. v. Westinghouse Elec. Corp.*, 385 F. Supp. 572 (D.C. 1974).

While it is clear that Husker Dodge, as the dealer selling the automobile in question, was not the agent of Chrysler Corporation for the sale of the automobile, it was such agent with respect to the warranty repairs under Chrysler Corporation's limited warranty. It is clear from the record that all of the repair work done by Husker Dodge on plaintiff's vehicle was authorized and paid for by Chrysler Corporation. Each dealer, by specific written agreement with the manufacturer, was authorized to perform warranty work at the expense of Chrysler Corporation. Through this agree-

ment, the manufacturer held out every dealer as its representative and agent to perform warranty work. Husker Dodge in no way adopted the manufacturer's warranty, and, in fact, sold the automobile on an "as is" basis, disclaiming any warranties whatsoever. However, with respect to the warranty work performed for Chrysler, it was clearly Chrysler's agent. It is a fundamental rule that an agent who contracts on behalf of a disclosed principal, in the absence of some other agreement to the contrary or other circumstances showing that the agent has expressly or impliedly incurred or intended to incur personal responsibility, is not liable to the other contracting party. The contract is that of the principal alone and the agent cannot be held liable thereon. See, *Bury v. Action Enterprises, Inc.*, 197 Neb. 38, 246 N.W.2d 724 (1976); *V.P.O., Inc. v. Money*, 201 Neb. 30, 266 N.W.2d 79 (1978); *Fisher v. Beebe & Runyan Furniture Co.*, 200 Neb. 349, 263 N.W.2d 826 (1978); 3 Am. Jur. 2d *Agency* § 261 (1962). In the present case, the warranty furnished by Chrysler Corporation to the buyer specifically instructed her to return the vehicle to her selling dealer's place of business or to any other authorized dealer for the performance of warranty work. Husker Dodge, which had consummated the sale, was fully responsible for all service requirements under the warranties given by Chrysler, and, by reason of its agency relationship with Chrysler Corporation, made the corporation liable as principal and seller for the warranty work performed. See, *Kure v. Chevrolet Motor Division*, 581 P.2d 603 (Wyo. 1978); *Eckstein v. Cummins*, 41 Ohio App. 2d 1, 321 N.E.2d 897 (1974). Although the record in this case indicates that the plaintiff brought her car back to Husker Dodge on various occasions during a period of approximately 6 weeks following the sale of the vehicle to her, for the purpose of repairing various defects in the automobile, the record is clear that the plaintiff was never denied repair services by

Husker Dodge, nor was she charged for same. The record reveals that Chrysler Corporation was billed for the repairs by Husker Dodge under its warranty repair agreement and, in fact, paid Husker Dodge for such repairs. There is testimony that the principal defect complained of was with regard to the transmission of the vehicle, and the transmission was, in fact, once replaced prior to the date that plaintiff's father returned the automobile to Husker Dodge. There was testimony at the trial of this matter by a representative of the service department of Husker Dodge that following the abandonment of the car by plaintiff's father on July 25, 1978, when demand was made for a new car, Husker Dodge, in fact, replaced the transmission a second time, although without knowledge on the part of the plaintiff at that time that such was being done. The service representative testified that after the installation of the second transmission, he had road tested and checked the vehicle and found that the transmission was working properly and was not defective. The Koperskis never picked up the automobile, but left it with Husker Dodge. The defendant U.S. National Bank subsequently repossessed the automobile and sold it at private sale and applied the proceeds on plaintiff's loan with the bank, as previously stated.

In its decree entered in this matter, the trial court specifically found that plaintiff had failed to prove that Chrysler Corporation had breached its warranty. We believe that under the rule regarding scope of review previously set out, there was sufficient evidence in the record to sustain this finding on the part of the trial court, and that the court was not clearly wrong.

We are aware of a line of cases which have afforded relief to the buyer of an automobile on the theory that the contract for the purchase of the automobile has failed of its essential purpose because of the fact that the warrantor has failed, neglected, or refused to make necessary and adequate repairs within a reasonable

time to place such vehicle in operating condition. In *Goddard v. G.M.C.*, 60 Ohio St. 2d 41, 396 N.E.2d 761 (1979), the court stated: "Although in most cases a limited remedy may be fair and reasonable, and satisfy the reasonable expectations of a new car purchaser, other courts and some commentators have generally recognized that when a seller is unable to fulfill its warranted obligation to effectively repair or replace defects in goods which are the subject matter of the sale, such as in the instant cause, the buyer is deprived of the benefits of the limited remedy and it therefore fails its essential purpose." *Id.* at 45, 396 N.E.2d at 764.

"In accordance with R.C. 1302.93(B), we conclude that where a new car express warranty limits a buyer's remedy to repair and replacement of defective parts, but when the new car is so riddled with defects that the limited remedy of repair and replacement fails its essential purpose, the buyer may institute an action to recover damages for breach of warranty under R.C. 1302.88(B) and, in a proper case, incidental and consequential damages under R.C. 1302.88(C) and 1302.89." *Id.* at 47, 396 N.E.2d at 765. To the same effect, see, *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784 (1978); *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349 (Minn. 1977); *Eckstein v. Cummins, supra; Ehlers v. Chrysler Motor Corp.*, 88 S.D. 612, 226 N.W.2d 157 (1975); *Kure v. Chevrolet Motor Division, supra; Murray v. Holiday Rambler, Inc.*, 83 Wis. 2d 406, 265 N.W.2d 513 (1978). However, as stated above, since we have found that the trial court was correct in its finding that plaintiff had failed to prove that Chrysler Corporation had breached its warranty, and that there was evidence in the record to support that finding, the rule enunciated in the above-cited cases cannot be applied to this case. While the result in this case might appear to be harsh, we are obligated to follow established principles of law, and we must conclude that the decree of the

trial court was correct. We affirm the action of the court in dismissing plaintiff's petition against all of the defendants herein.

AFFIRMED.