STAN SMITH, APPELLEE, V. PAOLI POPCORN CO., A NEBRASKA CORPORATION, FORMERLY KNOWN AS MORMAC POPCORN COMPANY, APPELLANT.

587 N.W. 2d 660

Filed January 8, 1999. No. S-97-1218.

Robert E. Wheeler for appellant.

James J. Paloucek, of Norman, Paloucek & Herman Law Offices, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

This is an action for damages arising from the alleged wrongful rejection of goods. The trial court granted summary judgment for the plaintiff on the issue of liability, finding that the defendant had ineffectively rejected the goods. The case proceeded to trial on damages, but prior to submitting the case to the jury, the trial court granted a directed verdict in the amount of $28,542.37.

## SCOPE OF REVIEW

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Barnett v. Peters*, 254 Neb. 74, 574 N.W.2d 487 (1998).

In reviewing an order granting a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists. *Miller v. City of Omaha*, 253 Neb. 798, 573 N.W.2d 121 (1998).

## FACTS

Stan Smith (Smith) and Paoli Popcorn Co. (Paoli) entered into a contract in which Paoli agreed to purchase popcorn grown by Smith in the 1994 season for 10 cents per pound. The contract provided in relevant part:

> When the Crop is fully matured, Grower [Smith] will harvest it in a good husbandlike manner, and will shell the Crop. . . . Grower will deliver the Crop to Buyer [Paoli] during normal business hours on any business day at . . . F.O.B. Grower's bin located at <u>Lamar NE</u>. . . . All Crop delivered by Grower under this contract will be FREE FROM FOREIGN MATTER, FIELD CORN AND FROM

MOLDY, DAMAGED OR IMMATURE POPCORN, AND IN A GOOD MARKETABLE CONDITION, AND WILL CONTAIN 16% MOISTURE OR LESS. . . . Buyer may discount at least $1.00/cwt or reject any of the Crop delivered or tendered for delivery under this contract that does not comply with all of the conditions, specifications and requirements set forth in this contract. Buyer may reject in full any delivery or tendered delivery of the Crop made or tendered under this contract if more than 10% of the Crop in such delivery or tendered delivery does not conform to the conditions, specifications and requirements set forth in this contract.

Smith harvested the popcorn either the last week of September or the first week of October 1994. During harvest, it began to mist, and Smith's son Steven Smith noticed smut attached to the last load of the harvested popcorn. At that time, an agent of Paoli, Thomas Harmon, visited the grain bins where the popcorn was being stored. Harmon obtained samples of the popcorn, noticed the smut, and spoke with Smith's son Rob Smith about the smut. Later, when Harmon was asked whether he had intended to reject the popcorn when he first noticed the smut, he responded that it was his intention to try to find a market for the popcorn so he would not have to officially reject it.

After the harvest, Harmon spoke with Steven Smith over the telephone and told him that he did not know if Paoli would be able to use the popcorn. Harmon denied specifically rejecting the popcorn during that telephone call.

In January 1995, Harmon spoke with Smith directly and told Smith that he was having difficulty finding a market for the popcorn. Harmon showed Smith a sample of good, marketable popcorn that satisfied the contract and a sample of Smith's popcorn for comparison. According to Harmon, the difference in quality was obvious. Harmon informed Smith that Paoli was trying to find a market where the popcorn could possibly be used and that he was checking into polishing the popcorn to remove the smut. Harmon told Smith that he would send out some samples of the popcorn in an effort to find a market, but to that point in time, there had been no interest in popcorn of such low quality. Harmon claimed he told Smith that he did not

know if Paoli could even use the popcorn at all and stated that Smith responded, " 'Yeah, I was kinda afraid of that.' "

Steven Smith did not think that the smut posed a "serious threat" to the marketability of the popcorn. He indicated that Harmon's comments that the popcorn would be difficult to market did not concern him, since "all processors . . . say that." According to Steven Smith, he was not informed that there might be any problem marketing the popcorn until at least 1 month after the harvest. Steven Smith denied that any negotiation of damages took place before April 1995.

The parties had conflicting opinions as to whether the smut could be cleaned from the popcorn. Smith believed that the popcorn could be cleaned prior to market and, consequently, that he was entitled to be paid the 10 cents per pound agreed upon in the contract. Harmon did not believe that the popcorn could be cleaned.

On April 4, 1995, Harmon called Smith and told him that Paoli was not going to be able to market the popcorn as premium popcorn because of the smut and that Paoli needed to officially reject it. In a letter dated April 6, Paoli rejected the popcorn in writing.

After the formal rejection, Paoli offered to buy the popcorn at a price of 8 cents per pound. Smith rejected this offer and made plans to sell the popcorn on the open market and then sue Paoli for damages. The popcorn market was poor at that time, and Smith had only received a quote of 5 cents per pound, but he still did not want to sell Paoli the popcorn for 8 cents per pound unless Paoli acknowledged that Smith was entitled to sue for the difference between the 8 cents currently offered and the 10 cents agreed upon in the contract.

Smith sued Paoli in October 1995 and alleged that Paoli had failed to seasonably, or within a reasonable time, notify Smith that the popcorn was rejected. Smith alleged that as a direct and proximate result of the breach of the contract, he had suffered general, special, and consequential damages, including the sale of the popcorn at a reduced price, storage fees, and lost interest. Smith died in September 1996, and the action was subsequently revived by Steven Smith, the personal representative of Smith's estate.

In June 1997, Smith filed a motion for summary judgment, claiming there were no issues of material fact as to the inadequacy of Paoli's rejection and revocation of acceptance of the tendered popcorn, which failure constituted an acceptance. Paoli filed a cross-motion for summary judgment, claiming it was entitled to judgment as a matter of law because it had given timely notice of its rejection of the tendered goods.

The trial court found that the following facts were not in dispute:

1. The plaintiff and the defendant entered into a written contract on March 31, 1994, for the defendant to purchase popcorn which was to be grown by the plaintiff on certain real estate. Among other things, the contract set out that delivery was to be F.O.B., the plaintiff's grain bin. Harvest of the popcorn occurred in late September or early October of 1994, and the popcorn harvested by the plaintiff was placed in the plaintiff's grain bin at harvest.

2. The defendant inspected the popcorn within a day or two of the harvest and delivery of the popcorn to the plaintiff's bin. At the time of that inspection, the defendant noticed that there was a "smut" problem . . . . The defendant knew at that time that the "smut" problem could not be corrected, but the defendant did not reject the popcorn and indicated to the plaintiff that the defendant was going to try to find a market for the popcorn and not officially reject it.

3. The defendant later informed the plaintiff through his son that the defendant did not know if the defendant would be able to market the popcorn or even if the defendant would be able to use it. The defendant again at that time did not reject the popcorn.

4. In January of 1995, the plaintiff stopped by the defendant's office to talk about the popcorn. The plaintiff wanted to know what the defendant might be able to do. The defendant again did not reject the popcorn at that time and again told the plaintiff that [it] was trying to find an outlet to allow the defendant to possibly use the popcorn. In addition, at that time, the defendant stated that it was checking into a polisher to better clean up the popcorn.

5. In January, 1995, the defendant knew that the popcorn could not be sold as premium popcorn, but again the defendant did not reject the popcorn.

6. The defendant inspected the popcorn at the plaintiff's grain bin on only one occasion after harvest even though the defendant knew that it could go to the grain bin for additional inspection at any time.

7. The popcorn was rejected verbally on April 4, 1995, and then in writing on April 6, 1995.

The trial court concluded as a matter of law that the rejection of the goods was not made within a reasonable time, and the case proceeded to trial on the issue of damages. At the close of all the evidence, Paoli's motion to dismiss was overruled. Smith moved for a directed verdict in the amount of $28,542.37, which motion was sustained, and a judgment was entered against Paoli in that amount. Paoli timely appealed.

## ASSIGNMENTS OF ERROR

On appeal, Paoli claims that the trial court erred in sustaining Smith's motion for summary judgment on the issue of effective rejection, in denying Paoli's motion for summary judgment on the issue of effective rejection, in sustaining Smith's objections to Paoli's offer of evidence relevant to material issues of good faith performance and enforcement of the contract and commercially reasonable resale, in failing to sustain Paoli's motion to dismiss, and in sustaining Smith's motion for directed verdict.

## ANALYSIS

The issue presented is whether Paoli failed to timely reject the popcorn. Neb. U.C.C. § 2-602(1) (Reissue 1992) provides: "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." See *Fabricators, Inc. v. Farmers Elevator, Inc.*, 203 Neb. 150, 277 N.W.2d 676 (1979).

Neb. U.C.C. § 2-606 (Reissue 1992) provides in part:

(1) Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) fails to make an effective rejection (subsection (1) of section 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

Neb. U.C.C. § 1-204 (Reissue 1992) provides:

(1) Whenever the Uniform Commercial Code requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.

(2) What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action.

(3) An action is taken "seasonably" when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time.

Prior to trial, Smith and Paoli each filed a motion for summary judgment. Smith claimed as a matter of law that Paoli's failure to adequately reject or revoke its acceptance of the tendered popcorn in a timely and unequivocal fashion constituted an acceptance of the popcorn. In response, Paoli claimed that there was no genuine issue of material fact that it had given adequate and timely notice of rejection to Smith. After reviewing the facts, the trial court found that the rejection of the popcorn had not been done in a reasonable amount of time after delivery or tender. The court specifically found that "a rejection of goods delivered in October of 1994 and finally rejected in April of 1995 is not seasonable and is completely ineffective."

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Barnett v. Peters*, 254 Neb. 74, 574 N.W.2d 487 (1998). We have also found that where the facts are undisputed or are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the trial court to decide the question as a matter of law

rather than submit it to the jury for determination. See *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 199 Neb. 697, 261 N.W.2d 358 (1978).

Although the facts in this case are largely undisputed, there is more than one inference that can be drawn as to whether Paoli rejected the popcorn within a reasonable amount of time. One inference is that there was no rejection of the goods until April 1995 and that a rejection of popcorn 6 to 7 months after delivery is, per se, unreasonable. The other inference would be that in light of the communication which ensued between the parties and considering that at all relevant times Smith knew that the popcorn contained smut and therefore was possibly not marketable, it was reasonable to delay rejecting the popcorn until all attempts to market it had failed.

Whether or not Paoli rejected the goods in a reasonable amount of time is a question of fact. What is a reasonable time depends upon the circumstances surrounding the action. In *Gustav Thieszen Irr. Co., Inc. v. Meinberg*, 202 Neb. 666, 276 N.W.2d 664 (1979), we considered whether the trial court should have determined as a matter of law, rather than submitting to the jury, the question of whether the delivery of the goods was effected within a reasonable time, since the contract in that case did not specify a delivery time. We stated that when there is no precise rule of law which governs, the question of what, under the circumstances of a particular case, is a reasonable amount of time is usually a question for the jury. See, also, *Koperski v. Husker Dodge, Inc.*, 208 Neb. 29, 302 N.W.2d 655 (1981) (noting that general rule is that questions whether goods are substantially impaired by nonconformity or whether revocation of acceptance is given within reasonable amount of time are questions of fact subject to jury's determination); *Duplex Mfg. Co. v. Atlas Leasing Corp.*, 184 Neb. 294, 166 N.W.2d 732 (1969) (holding that it was question for jury whether buyer had been given reasonable amount of time to inspect goods to see whether they conformed with contract); *Wendt v. Beardmore Suburban Chevrolet*, 219 Neb. 775, 779, 366 N.W.2d 424, 427 (1985) (finding that whether buyer has "exercise[d] ownership" over such goods is question of reasonableness and is question of fact).

Based upon the circumstances of this case and giving all reasonable inferences to Paoli, whether Paoli rejected the goods within a reasonable time presents a material issue of fact. Thus, the district court erred in granting summary judgment on this issue.

## CONCLUSION

We reverse the summary judgment and remand the cause for further proceedings. As the reversal of the summary judgment is decisive of this appeal, we need not address the other errors assigned by Paoli.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.